UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

CHRISTIAN MARGOSIAN,

        Plaintiff,                Case No. 1:21-cv-1061

v.                                        Honorable Ray Kent

UNKNOWN MARTINSON et al.,

        Defendant.
_____/

## **OPINION**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Plaintiff previously sought and was granted leave to proceed *in forma pauperis*. (ECF No. 4.) Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, Plaintiff consented to proceed in all matters in this action under the jurisdiction of a United States magistrate judge. (ECF No. 5.)

Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Nurse Rosalinda, Dr. Russell Morris, Unknown Doctor, the Unknown Parties from

Munson Healthcare Hospital, Grievance Coordinator T. Bassett, Sergeant Lively, Assistant Deputy Warden Clouse, and Warden Les Parish. Plaintiff's Eighth Amendment claims against Defendants Correctional Officer Martinson, Correctional Officer Sheppard, Dr. Robert Crompton, Registered Nurse Jack D. Bellinger, and the Unknown Parties from the Oaks Correctional Facility, however, remain in the case.

## Discussion

### I. Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Oaks Correctional Facility (ECF) in Manistee, Manistee County, Michigan. The events about which he complains occurred at that facility, as well as the Munson Healthcare Hospital in Manistee, Michigan. Plaintiff sues the following ECF personnel: Warden Les Parish; Assistant Deputy Warden Unknown Clouse; Grievance Coordinator T. Bassett; Doctor Robert Crompton; Nurse Jack D. Bellinger; Sergeant Unknown Lively; Correctional Officers Unknown Martinson and Unknown Sheppard; and Unknown Parties #3. Additionally, Plaintiff sues the following personnel from Munson Healthcare Hospital in Manistee, Michigan: Doctors Russell Morris and Unknown Party #2; Nurse Rosalinda Unknown Party #1; and Unknown Parties #4.

Plaintiff alleges that on July 11, 2019, he was playing in a 3-on-3 basketball game during recreation when he "collapsed to the ground for a right knee dislocation." (ECF No. 1., PageID.3.) Plaintiff began screaming for help and saw that his lower extremity was "visibly [crooked]." (*Id.*) After fifteen minutes had passed, Defendant Bellinger brought a wheelchair, and Plaintiff told Defendant Bellinger that he needed to go to the hospital. (*Id.*) Defendant Bellinger ordered Plaintiff to get in the wheelchair; Plaintiff responded that he was unable. (*Id.*) Plaintiff told Defendant Bellinger to "back off" because he was not helping, and he was able to get into the wheelchair with help from inmate Ferman Rivera Averrado. (*Id.*, PageID.4.) Plaintiff

2

avers that he was forced to hold his leg in place to prevent his foot from falling off the footrest and causing more pain. (*Id.*)

Defendant Bellinger wheeled Plaintiff to the health care room within Plaintiff's housing unit. (*Id.*) Plaintiff twice told Defendant Bellinger that he needed emergency care; Defendant Bellinger ignored his requests. (*Id.*) Defendant Bellinger refused to provide Plaintiff something for pain and "tossed Plaintiff an ace bandage." (*Id.*) Plaintiff tried to wrap his knee, but "the compression of the bandage exacerbated the pain level greatly[, so he] immediately took the bandage off and put it to his side." (*Id.*) Defendant Bellinger also refused Plaintiff's request for assistance in securing his foot by tying the ace bandage around the footrest. (*Id.*, PageID.4–5.)

Defendant Bellinger left the room, leaving Plaintiff with Officer Weller. (*Id.*, PageID.5.) Plaintiff's foot then slid off the wheelchair footrest and "slapped against the floor," causing Plaintiff to scream loudly. (*Id.*) Plaintiff was "forced to raise his foot off the floor by lifting from the leg." (*Id.*) Defendant Bellinger returned and did not answer Plaintiff's questions regarding where Defendant Crompton was and why he was not being taken to the Control Center for transport to a hospital. (*Id.*) Ultimately, forty minutes after the initial injury had occurred, Officer Bartarue arrived and took Plaintiff to the Control Center. (*Id.*, PageID.5–6.) Plaintiff asked Officer Bartarue to secure his foot to the footrest using the ace bandage, and she did. (*Id.*, PageID.6.)

Forty-five minutes later, Plaintiff was wheeled to the main entrance, where he encountered Defendant Martinson. (*Id.*) A non-wheelchair accessible transport van pulled up for transport. (*Id.*) Plaintiff avers that Defendants Martinson, Sheppard, and other unknown parties responsible knew that Plaintiff "could not just simply rise up from the wheelchair, and walk and jump into a regular state transport van." (*Id.*) Plaintiff asked Defendant Martinson for a

3

wheelchair-accessible van, and one pulled up twenty minutes later. (*Id.*, PageID.6–7.) Defendants Martinson and Sheppard then spent twenty-five minutes unsuccessfully trying to get the wheelchair lift to lower. (*Id.*, PageID.7.) Ultimately, the lift was manually lowered, and Defendants Martinson and Sheppard transported Plaintiff to the Munson Healthcare Hospital in Manistee. (*Id.*)

After Plaintiff was removed from the transport van, Defendant Martinson pulled out his cellphone and told Plaintiff, "We're not going anywhere until I get this on Snapchat." (*Id.*, PageID.8.) He directed Plaintiff to lift his shorts. (*Id.*) Plaintiff felt "helpless and vulnerable" and ultimately complied. (*Id.*) Defendant Martinson took a picture of Plaintiff's knee, then told Plaintiff he was "typing in the message, 'a knee shouldn't look like that,' to go with the picture when he posted it to social media." (*Id.*)

Plaintiff was then wheeled into the emergency room, and Defendant Sheppard had to call Oaks Correctional Facility to have unknown personnel forward Plaintiff's medical file to the hospital because no one had called the hospital to inform them that a prisoner was being transported there. (*Id.*) Plaintiff told unnamed individuals at the front desk that he had not been provided anything for his pain and requested that he be provided pain medication and anti-inflammatories. (*Id.*) Plaintiff, however, was only wheeled into a room close to the front desk. (*Id.*)

Twenty minutes later, Defendant Rosalinda entered, and Plaintiff asked her for pain medication. (*Id.*) She refused, stating "We don't give prisoners pain medication for something like this." (*Id.*) She "flashed a grin then left the room." (*Id.*) Defendant Morris came in, and Plaintiff asked for "some form of pain medication or at a minimum anti-inflammatories." (*Id.*) Defendant Morris, however, refused. (*Id.*) He told Plaintiff, "You're a prisoner, I just can't give

4

you whatever you want," and left the room. (*Id.*, PageID.10.) Defendant Martinson then pulled out his phone and "announced that the Snapchat he previously sent out was 'blowing up'" and told Plaintiff that "he was sending out a message to those who inquired, that the injury was not his own, but rather was a prisoner's injury he was on transport for." (*Id.*)

Defendant Rosalinda returned and told Plaintiff that he needed to get on the hospital bed; Plaintiff responded that he "could not move because his knee was dislocated and he was in full body shackles." (*Id.*) Defendant Rosalinda told Plaintiff that if he did not get on the bed, he would not receive care. (*Id.*) Defendant Morris heard that statement and seconded it, and both then left the room. (*Id.*) Plaintiff untied the ace bandage and tried to get out of the wheelchair; Defendants Martinson and Sheppard refused his requests for help. (*Id.*) Plaintiff "somehow managed to raise himself out of the wheelchair to stand on his left uninjured foot." (*Id.*, PageID.11.) Plaintiff's dislocated knee began "sliding/shifting in and out," causing "tortuous pain." (*Id.*) Ultimately, Plaintiff was "able to position himself with half his bottom on the hospital bed and half of it off," and Defendant Rosalinda eventually held his injured leg to stabilize it. (*Id.*)

Defendant Morris returned, and Defendant Sheppard removed the shackle from Plaintiff's right leg. (*Id.*, PageID.12.) Defendant Morris began "to pull, straighten, shift, yank, and push on Plaintiff's leg and knee," causing Plaintiff to scream in pain. (*Id.*) He screamed for Defendant Morris to stop and again asked for pain medication, which Defendants Morris and Rosalinda refused. (*Id.*) Defendants Morris and Rosalinda left and two unknown individuals entered to prep Plaintiff for X-rays. (*Id.*) After the X-rays, Defendants Morris, Rosalinda, and Unknown Doctor came in. (*Id.*, PageID.13.) Defendant Unknown Doctor refused Plaintiff's request for pain medication. (*Id.*) Plaintiff avers that by this time, over three hours had passed from his initial injury. (*Id.*) Defendant Unknown Doctor told everyone to hold Plaintiff down and

eventually put Plaintiff's knee back in place. (*Id.*) All hospital staff left, and Defendant Martinson took out his phone and took another picture of Plaintiff's knee. (*Id.*) When Plaintiff asked what he was doing, Defendant Martinson responded that he "just want[ed] to post the before and after pictures online." (*Id.*) Ten to fifteen minutes later, Defendants Morris and Rosalinda returned, and Plaintiff asked for an MRI to determine if any ligaments or tendons had been damaged, as well as crutches. (*Id.*) Both requests were refused. (*Id.*) Plaintiff was discharged, and the ECF medical department was instructed to provide Plaintiff "crutches, ice, and pain and anti-inflammatory medication" upon his return. (*Id.* PageID.14.)

When he returned, Plaintiff reminded Defendant Martinson about seeing the medical staff at ECF. (*Id.*) Defendant Martinson responded that the medical department had been contacted and would see Plaintiff "shortly." (*Id.*) He also stated, "One last thing Margosian . . . if I were you, I wouldn't write a grievance on me for anything. I got friends all over and we wouldn't want something to happen to you." (*Id.*) Plaintiff avers that he was never seen by the medical department that day and was unable to relax or move because of the pain. (*Id.*) Plaintiff alleges further that his sleep condition, parasomnia, exacerbated his pain. (*Id.*, PageID.15.)

Plaintiff was called to medical to see Defendant Crompton at 9:00 a.m. on July 12, 2019. (*Id.*) Defendant Crompton examined his knee and "affirmed it was severely swollen and significantly larger in comparison to Plaintiff's left knee." (*Id.*) Plaintiff asked for an MRI, knee brace, and pain medication. (*Id.*) Defendant Crompton told Plaintiff that "he would only be prescribing him crutches, ice, and ibuprofen." (*Id.*) When Plaintiff responded that ibuprofen would not help the pain, Defendant Crompton "told Plaintiff that because he was a prisoner, he couldn't give him anything stronger, and that he didn't care either way." (*Id.*)

6

Plaintiff received ice and crutches later that day. (*Id.*, PageID.16.) However, he did not receive ibuprofen until July 13, 2019, and avers that it "did absolutely nothing to combat the severe pain." (*Id.*) On July 14, 2019, Plaintiff submitted a medical kite request asking for a cane because the "crutches provided were inadequate and [he] had almost fallen twice while using them." (*Id.*, PageID.17.) The next day, Nurse Drake informed Plaintiff that a cane would be provided. (*Id.*)

On July 17, 2019, Plaintiff submitted two medical kites, asking for stronger pain medication and a knee brace, and reminding Defendant Crompton that, per Defendant Morris's instructions, he was to be seen one week after his injury. (*Id.*) Plaintiff also submitted a mental health request, asking to speak with a psychologist. (*Id.*) The next day, Plaintiff submitted another medical kite, stating that he had seen Defendant Crompton in the main lobby of his unit and asked him if he was scheduled to see Plaintiff. (*Id.*) Defendant Crompton responded that Plaintiff was not scheduled "and would not know when he could schedule to see Plaintiff." (*Id.*) On July 19, 2019, Plaintiff received a response to his request from RN Pant indicating that his chart review had been sent to Defendant Crompton and that he would be scheduled for an evaluation. (*Id.*, PageID.17–18.)

Plaintiff saw Defendant Crompton again on July 19, 2019, at which time he again denied Plaintiff's requests for stronger pain medication, a knee brace, and MRI. (*Id.*, PageID.18.) Plaintiff avers that his medical records indicate that he was given strengthening exercises, but that "he was not provided with any such treatment." (*Id.*) That same day, medical issued an order extending Plaintiff's use of a cane to August 15, 2019. (*Id.*)

On July 30, 2019, Plaintiff submitted a request for stronger pain medication, alleging that "the ibuprofen was not strong enough to combat the pain and was making [him]

7

constipated." (*Id.*) On July 31, 2019, Plaintiff had a therapy session, during which he expressed his concerns over being deprived adequate medical care. (*Id.*) Plaintiff saw Nurse Mason on August 1, 2019, and avers that she was "very rude" and told Plaintiff he would have to pay a copay because his request did not constitute follow-up care. (*Id.*, PageID.18–19.) Plaintiff "politely excused himself" and left. (*Id.*, PageID.19.) Shortly thereafter, he was given naproxen to replace the ibuprofen, but avers that it "was not effective as well to combat the severe pain [he] was in." (*Id.*)

Plaintiff's allegations resume after a two-month gap when he submitted another medical request on October 11, 2019, stating that the ibuprofen and naproxen had not helped and that he continued to experience sharp pain in his knee. (*Id.*) Plaintiff indicated that he could not jog or squat "without excruciating pain and a feeling of collapsing." (*Id.*) He could not walk up and down stairs without pain and stated that his knee constantly "pops." (*Id.*) Plaintiff reiterated his requests for an MRI, knee brace, and stronger medication. (*Id.*) On October 13, 2019, Nurse Mason responded, but Plaintiff avers that the response only "documents the need to consult about stronger pain medication." (*Id.*, PageID.19–20.) Plaintiff saw Nurse Pant on October 15, 2019, in response to his medical request. (*Id.*, PageID.20.) Nurse Pant "notably documented the existence of (1): tenderness (2): palpable distal pulses (3): pain with movement (4): swelling (5): crepit[u]s and popping with passive range of motion, and (6): tenderness to medial knee and patella tendon area." (*Id.*) He noted that Plaintiff's requests for an MRI, knee brace, and stronger pain medication would be forwarded to Defendant Crompton. (*Id.*)

Plaintiff saw Defendant Crompton on October 16, 2019. (*Id.*) Defendant Crompton checked Plaintiff's blood pressure and heart, had Plaintiff weigh himself, and used a tape measure to check the circumference of Plaintiff's right thigh and calf muscles. (*Id.*) Defendant Crompton

asked Plaintiff to perform a squat, and Plaintiff responded that he was physically unable to comply. (*Id.*, PageID.20–21.) Plaintiff reasserted his requests for an MRI, knee brace, and stronger pain medication. (*Id.*, PageID.21.) Defendant Crompton "acknowledged the knee was swollen and the presence of pain existed, but wholly failed to document that in his medical report of October 16, 2019, . . . even though RN Pant documented it in his report the previous day." (*Id.*) Plaintiff also asked to see an orthopedic surgeon, but Defendant Crompton "replied that with a patella dislocation, an orthopedic surgeon is never required to consult with, nor is an MRI ever needed because no structures are ever damaged." (*Id.*) He told Plaintiff that "it could be up to 2 years before the knee could become healed." (*Id.*)

Plaintiff filed a grievance concerning Defendant Crompton's care on October 18, 2019. (*Id.*) Defendant Bellinger responded, noting that Plaintiff was being referred to Defendant Crompton because of his continued complaints. (*Id.*, PageID21–22.) Plaintiff, however, avers that Defendant Crompton "never again consulted with [him] about his injury." (*Id.*, PageID.22.)

On November 23, 2019, Plaintiff requested medical care after injuring his lower back "when he went to reach down to retrieve a book but bent awkward[ly] because he was forced to factor in his injured right knee." (*Id.*) Plaintiff saw Nurse Dankert on November 26, 2019, for his lower back and sciatic pain. (*Id.*, PageID.23.) Nurse Dankert "ordered a hot water bottle detail and rest." (*Id.*)

More than a year after the initial injury, Plaintiff saw Defendant Crompton in August 2020 for chronic care. (*Id.*) He told Defendant Crompton that he "was still experiencing problems with his knee; constant pain, discomfort, popping and grinding, a feeling the knee would give out, and constant instability." (*Id.*) Plaintiff alleges that Defendant Crompton responded that "he didn't care because Plaintiff must be lying, and that Plaintiff needed to leave the medical

9

room." (*Id.*) Plaintiff left, but returned to ask a question, at which time Defendant Crompton allegedly "rose from his chair and aggressively began charging after Plaintiff." (*Id.*)

On January 24, 2021, Plaintiff was moved to an adjacent cell because of close contact regarding COVID-19. (*Id.*) As he was cleaning the new cell on January 25, 2021, "he made a quick turn and his knee slipped out of place, but then slid back into place again; the injury is medically referred to as a subluxation. And it was very painful." (*Id.*) Plaintiff saw Defendant Bellinger the next day for a rapid COVID-19 test and told him what happened; Defendant Bellinger stated, "I'm not here for that, just for Covid testing." (*Id.*) According to Plaintiff, he was in severe pain, his right knee was swollen and unstable, and he could not shower for four days because of the injury. (*Id.*)

On February 7 or 8, 2021, Plaintiff was bunked with inmate O'Brien, who also had COVID-19. (*Id.*, PageID.23–24.) Plaintiff avers that inmate O'Brien required health care for breathing complications, and Defendant Crompton ultimately responded. (*Id.*, PageID.24.) Plaintiff relayed inmate O'Brien's responses to Defendant Crompton. (*Id.*) Afterwards, Defendant Crompton asked Plaintiff how he was. (*Id.*) Plaintiff told him about the subluxation that had occurred two weeks prior. (*Id.*) Defendant Crompton responded that Plaintiff was lying and "needed to stop faking the injury." (*Id.*) Plaintiff "swore that he was telling the truth." (*Id.*) Defendant Crompton responded, "You're not in pain; you have since fully recovered; and I doubt you slipped the kneecap out again." (*Id.*)

Plaintiff saw Defendant Crompton again on August 6, 2021, for an annual checkup for his high blood pressure and bottom-bunk status for his parasomnia. (*Id.*) Plaintiff told Defendant Crompton that he was still having issues with his knee. (*Id.*) Defendant Crompton responded that Plaintiff could not have any problems and that it was "in his head." (*Id.*) Plaintiff

10

asked to see an orthopedic specialist. (*Id.*) Defendant Crompton denied the request and said that Plaintiff was lying about his pain, discomfort, and instability. (*Id.*) Plaintiff avers that his "knee remains in constant pain and instability." (*Id.*, PageID.25.)

Plaintiff submitted various grievances about the events set forth *supra*. He was interviewed about his grievance concerning Defendant Martinson by Defendant Lively. (*Id.*, PageID.29.) Defendant Lively told Plaintiff that she would speak to Defendants Martinson and Sheppard, and then "get back with" Defendant Bassett. (*Id.*, PageID.31.) According to Plaintiff, Defendant Lively said the process "would be continued most likely with Internal Affairs." (*Id.*) Plaintiff, however, received a rejection of his grievance as untimely from Defendant Bassett on August 27, 2019. (*Id.*) Ultimately, all of Plaintiff's grievances were denied, and Defendants Bassett, Clouse, and Parish were involved in those denials. (*Id.*, PageID.31–41.)

Plaintiff seeks injunctive relief directing that he be seen by an orthopedic specialist, declaratory relief, and compensatory and punitive damages. (*Id.*, PageID.71–75.).

## II. Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at

679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A. Defendants Morris, Nurse Rosalinda Unknown Party #1, Doctor Unknown Party #2, and Unknown Parties #4 from the Munson Healthcare Hospital

Plaintiff has sued Defendants Morris, Nurse Rosalinda Unknown Party #1, Doctor Unknown Party #2, and various Unknown Parties #4, all of whom are employed at the Munson Healthcare Hospital in Manistee, Michigan. The Court must first determine whether Plaintiff has properly named these Defendants as parties to his § 1983 claims.

To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dominguez v. Corr. Med.*

*Servs.*, 555 F.3d 543, 549 (6th Cir. 2009); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). In order for a private party's conduct to be under color of state law, it must be "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *Street*, 102 F.3d at 814. There must be "a sufficiently close nexus between the State and the challenged action of [the defendant] so that the action of the latter may be fairly treated as that of the State itself." *Skelton v. Pri-Cor, Inc.*, 963 F.2d 100, 102 (6th Cir. 1991) (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).

Where the defendants are not state officials, their conduct will be deemed to constitute state action only if it meets one of three narrow tests. The first is the symbiotic relationship test, or nexus test, in which the inquiry focuses on whether "the State had so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Jackson*, 419 U.S. at 357–58. Second, the state compulsion test describes situations "in which the government has coerced or at least significantly encouraged the action alleged to violate the Constitution." *NBC v. Commc'ns Workers of Am.*, 860 F.2d 1022, 1026 (11th Cir. 1988); *accord Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 170 (1970). Finally, the public function test covers private actors performing functions "traditionally the exclusive prerogative of the State." *Jackson*, 419 U.S. at 353; *accord West*, 487 U.S. at 49–50. *See generally*, *Lugar*, 457 U.S. at 936–39 (discussing three tests).

Plaintiff has presented no allegations from which the Court could fairly attribute the actions of these Defendants to the state. The fact that the Munson Healthcare Hospital may receive public funding and that the hospital and the various medical providers are licensed by the State does not render them "state actors" for purposes of § 1983. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982) (nonprofit, privately operated school's receipt of public funds did not make

13

its employee discharge decisions acts of state subject to suit under federal statute governing civil action for deprivation of rights); *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006) (allegation that hospital and social worker were subject to state licensing was insufficient to support finding that defendants were acting under color of state law); *Adams v. Vandemark*, 855 F.2d 312, 315–16 (6th Cir. 1988) (fact that nonprofit corporation was funded almost entirely by public sources, and was subject to state regulation, without more, is insufficient to make private entity's decision to discharge employees attributable to state for purpose of § 1983 action). Moreover, even if these Defendants treated Plaintiff at the State's request and expense, they did not thereby become state actors. *See Rendell-Baker*, 457 U.S. at 841 ("[a]cts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts"); *Styles v. McGinnis*, 28 F. App'x 362, 364 (6th Cir. 2001) (agreeing that an emergency room doctor did not become a state actor solely because he provided healthcare to a State inmate). The Court, therefore, will dismiss Plaintiff's § 1983 claims against Defendants Morris, Nurse Rosalinda Unknown Party #1, Doctor Unknown Party #2, and the Unknown Parties #4 at the Munson Healthcare Hospital for failure to allege state action.

### B. Defendants Bassett, Lively, Clouse, and Parish

Plaintiff explicitly indicates that he has sued Defendants Bassett, Lively, Clouse, and Parish based upon a theory of supervisory liability. (ECF No. 1, PageID.2.) Government officials, however, may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). Rather, a claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d

889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Here, Plaintiff's claims against Defendants Bassett, Lively, Clouse, and Parish are solely based upon their involvement in the grievance process, and he has failed to allege that any of them engaged in any active unconstitutional behavior. Plaintiff, therefore, has failed to state a claim against Defendants Bassett, Lively, Clouse and Parish.

### C. Defendants Martinson, Sheppard, Crompton, Bellinger, and Unknown Parties #3 at the Oaks Correctional Facility

Plaintiff alleges that Defendants Martinson, Sheppard, Crompton, Bellinger, and Unknown Parties from ECF violated his Eighth Amendment rights by failing to provide adequate medical care and delaying the receipt of medical care for his right knee injury. Plaintiff also avers that Defendant Martinson violated his Eighth Amendment rights by delaying his medical treatment to take pictures of his injury and post them on social media. (*See generally* ECF No. 1.)

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial

15

of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347). As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836. "[P]rison officials who actually

16

knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

As part of the obligation to protect prisoners from substantial risks to their health or safety, the Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104–05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). Deliberate indifference may be manifested by a doctor's failure to respond to the medical needs of a prisoner, or by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle*, 429 U.S. at 104–05.

Although Plaintiff has by no means proven deliberate indifference on the part of the remaining ECF Defendants, his factual allegations, accepted as true, support the inference that Plaintiff suffered a serious medical need and that the Defendants may have been deliberately indifferent to that need. Therefore, the Court concludes that Plaintiff has alleged sufficient facts to support Eighth Amendment claims against Defendants Martinson, Sheppard, Crompton, Bellinger, and the Unknown Parties at the Oaks Correctional Facility.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Dr. Russell Morris, Nurse Rosalinda Unknown Party #1, Doctor Unknown Party #2, the Unknown Parties #4 from the Munson Healthcare Hospital, Grievance Coordinator T. Bassett, Sergeant Lively, Assistant Deputy Warden Clouse, and Warden Les Parish will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42

U.S.C. § 1997e(c).  Plaintiff's Eighth Amendment claims against Defendants Correctional Officer Martinson, Correctional Officer Sheppard, Dr. Robert Crompton, Registered Nurse Jack D. Bellinger, and the Unknown Parties #3 at the Oaks Correctional Facility remain in the case.

An order consistent with this opinion will be entered.


Dated:   January 11, 2022                             /s/ Ray Kent
                                                              Ray Kent
                                                              United States Magistrate Judge