UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTIAN MARGOSIAN,

    Plaintiff,

v.

UNKNOWN MARTINSON, *et al.*,

    Defendants.
_____/

Case No. 1:21-cv-1061

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by Christian Margosian (referred to as "plaintiff" or "Margosian"), a prisoner in the custody of the Michigan Department of Corrections (MDOC). Margosian filed a 76-page complaint with 107 exhibits (*see* ECF No. 1, PageID.1-76); ECF Nos. 1-1 through 1-107). The Court dismissed most of the defendants and most of the claims on initial screening. Four of the 13 original defendants remain: Dr. Robert Crompton; Nurse Jack D. Bellinger; Correction Officer (CO) Martinson; and CO Sheppard. This matter is now before the Court on motions for summary judgment for lack of exhaustion filed by defendants Dr. Crompton (ECF No. 27) and by defendants Martinson, Sheppard, and Nurse Bellinger (collectively the "MDOC defendants") (ECF No. 36).

    **I.**    **Margosian's allegations**

    **A.**    **Injury and hospital visit**

Margosian's remaining claims are related to a right knee injury, which occurred on July 11, 2019, while he was playing basketball at the MDOC's Oaks Correctional Facility (ECF)

1

in Manistee, Michigan. Opinion (ECF No. 6, PageID.370). On that date, Margosian alleged that he "collapsed to the ground" with "a right knee dislocation." *Id*. Margosian further alleged:

> After fifteen minutes had passed, Defendant Bellinger brought a wheelchair, and Plaintiff told Defendant Bellinger that he needed to go to the hospital. (*Id.*) Defendant Bellinger ordered Plaintiff to get in the wheelchair; Plaintiff responded that he was unable. (*Id.*) Plaintiff told Defendant Bellinger to "back off" because he was not helping, and he was able to get into the wheelchair with help from inmate Ferman Riverra Averrado. (*Id.*, PageID.4.) Plaintiff avers that he was forced to hold his leg in place to prevent his foot from falling off the footrest and causing more pain. (*Id.*)
>
> Defendant Bellinger wheeled Plaintiff to the health care room within Plaintiff's housing unit. (*Id.*) Plaintiff twice told Defendant Bellinger that he needed emergency care; Defendant Bellinger ignored his requests. (*Id.*) Defendant Bellinger refused to provide Plaintiff something for pain and "tossed Plaintiff an ace bandage." (*Id.*) Plaintiff tried to wrap his knee, but "the compression of the bandage exacerbated the pain level greatly[, so he] immediately took the bandage off and put it to his side." (*Id.*) Defendant Bellinger also refused Plaintiff's request for assistance in securing his foot by tying the ace bandage around the footrest. (*Id.*, PageID.4-5.)
>
> Defendant Bellinger left the room, leaving Plaintiff with [non-party] Officer Weller. (*Id.*, PageID.5.) Plaintiff's foot then slid off the wheelchair footrest and "slapped against the floor," causing Plaintiff to scream loudly. (*Id.*) Plaintiff was "forced to raise his foot off the floor by lifting from the leg." (*Id.*) Defendant Bellinger returned and did not answer Plaintiff's questions regarding where Defendant Crompton was and why he was not being taken to the Control Center for transport to a hospital. (*Id.*) Ultimately, forty minutes after the initial injury had occurred, [non-party] Officer Bartarue arrived and took Plaintiff to the Control Center. (*Id.*, PageID.5-6.) Plaintiff asked Officer Bartarue to secure his foot to the footrest using the ace bandage, and she did. (*Id.*, PageID.6.)
>
> Forty-five minutes later, Plaintiff was wheeled to the main entrance, where he encountered Defendant [CO] Martinson. (*Id.*) A non-wheelchair accessible transport van pulled up for transport. (*Id.*) Plaintiff avers that Defendants Martinson, [CO] Sheppard, and other unknown parties responsible knew that Plaintiff "could not just simply rise up from the wheelchair, and walk and jump into a regular state transport van." (*Id.*) Plaintiff asked Defendant Martinson for a wheelchair-accessible van, and one pulled up twenty minutes later. (*Id.*, PageID.6-7.) Defendants Martinson and Sheppard then spent twenty-five minutes unsuccessfully trying to get the wheelchair lift to lower. (*Id.*, PageID.7.) Ultimately, the lift was manually lowered, and Defendants Martinson and Sheppard transported Plaintiff to the Munson Healthcare Hospital in Manistee. (*Id.*)

2

After Plaintiff was removed from the transport van, Defendant Martinson pulled out his cellphone and told Plaintiff, "We're not going anywhere until I get this on Snapchat." (*Id*., PageID.8.) He directed Plaintiff to lift his shorts. (*Id*.) Plaintiff felt "helpless and vulnerable" and ultimately complied. (*Id*.) Defendant Martinson took a picture of Plaintiff's knee, then told Plaintiff he was "typing in the message, 'a knee shouldn't look like that,' to go with the picture when he posted it to social media." (*Id*.)

Plaintiff was then wheeled into the emergency room, and Defendant Sheppard had to call Oaks Correctional Facility to have unknown personnel forward Plaintiff's medical file to the hospital because no one had called the hospital to inform them that a prisoner was being transported there. (*Id*.) Plaintiff told unnamed individuals at the front desk that he had not been provided anything for his pain and requested that he be provided pain medication and anti-inflammatories. (*Id*.) Plaintiff, however, was only wheeled into a room close to the front desk. (*Id*.)

Twenty minutes later, [Former] Defendant [Nurse] Rosalinda entered, and Plaintiff asked her for pain medication. (*Id*.) She refused, stating "We don't give prisoners pain medication for something like this." (*Id*.) She "flashed a grin then left the room." (Id.) [Former] Defendant [Dr.] Morris came in, and Plaintiff asked for "some form of pain medication or at a minimum anti-inflammatories." (*Id*.) [Former] Defendant [Dr.] Morris, however, refused. (*Id*.) He told Plaintiff, "You're a prisoner, I just can't give you whatever you want," and left the room. (*Id*., PageID.10.) Defendant Martinson then pulled out his phone and "announced that the Snapchat he previously sent out was 'blowing up'" and told Plaintiff that "he was sending out a message to those who inquired, that the injury was not his own, but rather was a prisoner's injury he was on transport for." (*Id*.)

[Former] Defendant [Nurse] Rosalinda returned and told Plaintiff that he needed to get on the hospital bed; Plaintiff responded that he "could not move because his knee was dislocated and he was in full body shackles." (*Id*.) [Former] Defendant [Nurse] Rosalinda told Plaintiff that if he did not get on the bed, he would not receive care. (*Id*.) [Former] Defendant Morris heard that statement and seconded it, and both then left the room. (*Id*.) Plaintiff untied the ace bandage and tried to get out of the wheelchair; Defendants Martinson and Sheppard refused his requests for help. (*Id*.) Plaintiff "somehow managed to raise himself out of the wheelchair to stand on his left uninjured foot." (*Id*., PageID.11.) Plaintiff's dislocated knee began "sliding/shifting in and out," causing "tortuous pain." (*Id*.) Ultimately, Plaintiff was "able to position himself with half his bottom on the hospital bed and half of it off," and Defendant Rosalinda eventually held his injured leg to stabilize it. (*Id*.)

[Former] Defendant [Dr.] Morris returned, and Defendant Sheppard removed the shackle from Plaintiff's right leg. (*Id*., PageID.12.) [Former] Defendant [Dr.] Morris began "to pull, straighten, shift, yank, and push on

3

Plaintiff's leg and knee," causing Plaintiff to scream in pain. (*Id*.) He screamed for [Former] Defendant [Dr.] Morris to stop and again asked for pain medication, which [Former] Defendants [Dr.] Morris and [Nurse] Rosalinda refused. (*Id*.) [Former] Defendants [Dr.] Morris and [Nurse] Rosalinda left and two unknown individuals entered to prep Plaintiff for X-rays. (*Id*.) After the X-rays, [Former] Defendants [Dr.] Morris, [Nurse] Rosalinda, and Unknown Doctor came in. (*Id*., PageID.13.) [Former] Defendant Unknown Doctor refused Plaintiff's request for pain medication. (*Id*.) Plaintiff avers that by this time, over three hours had passed from his initial injury. (*Id*.) [Former] Defendant Unknown Doctor told everyone to hold Plaintiff down and eventually put Plaintiff's knee back in place. (*Id*.) All hospital staff left, and Defendant Martinson took out his phone and took another picture of Plaintiff's knee. (*Id*.) When Plaintiff asked what he was doing, Defendant Martinson responded that he "just want[ed] to post the before and after pictures online." (*Id*.) Ten to fifteen minutes later, [Former] Defendants [Dr.] Morris and [Nurse] Rosalinda returned, and Plaintiff asked for an MRI to determine if any ligaments or tendons had been damaged, as well as crutches. (*Id*.) Both requests were refused. (*Id*.) Plaintiff was discharged, and the ECF medical department was instructed to provide Plaintiff "crutches, ice, and pain and anti-inflammatory medication" upon his return. (*Id*. PageID.14.)

When he returned, Plaintiff reminded Defendant Martinson about seeing the medical staff at ECF. (*Id*.) Defendant Martinson responded that the medical department had been contacted and would see Plaintiff "shortly." (*Id*.) He also stated, "One last thing Margosian . . . if I were you, I wouldn't write a grievance on me for anything. I got friends all over and we wouldn't want something to happen to you." (*Id*.) Plaintiff avers that he was never seen by the medical department that day and was unable to relax or move because of the pain. (*Id*.) Plaintiff alleges further that his sleep condition, parasomnia, exacerbated his pain. (*Id*., PageID.15.)

Opinion at PageID.370-374.

### B. Dr. Crompton's initial treatment commencing on July 12, 2019

Plaintiff was called to medical to see Defendant Crompton at 9:00 a.m. on July 12, 2019. (*Id*.) Defendant Crompton examined his knee and "affirmed it was severely swollen and significantly larger in comparison to Plaintiff's left knee." (*Id*.) Plaintiff asked for an MRI, knee brace, and pain medication. (*Id*.) Defendant Crompton told Plaintiff that "he would only be prescribing him crutches, ice, and ibuprofen." (*Id*.) When Plaintiff responded that ibuprofen would not help the pain, Defendant Crompton "told Plaintiff that because he was a prisoner, he couldn't give him anything stronger, and that he didn't care either way." (*Id*.)

Plaintiff received ice and crutches later that day. (*Id*., PageID.16.) However, he did not receive ibuprofen until July 13, 2019, and avers that it "did absolutely nothing to combat the severe pain." (*Id*.) On July 14, 2019, Plaintiff submitted a medical kite request asking for a cane because the "crutches provided were

4

inadequate and [he] had almost fallen twice while using them." (*Id*., PageID.17.) The next day, [non-party] Nurse Drake informed Plaintiff that a cane would be provided. (*Id*.)

On July 17, 2019, Plaintiff submitted two medical kites, asking for stronger pain medication and a knee brace, and reminding Defendant Crompton that, per [Former] Defendant [Dr.] Morris's instructions, he was to be seen one week after his injury. (*Id*.) Plaintiff also submitted a mental health request, asking to speak with a psychologist. (*Id*.) The next day, Plaintiff submitted another medical kite, stating that he had seen Defendant Crompton in the main lobby of his unit and asked him if he was scheduled to see Plaintiff. (*Id*.) Defendant Crompton responded that Plaintiff was not scheduled "and would not know when he could schedule to see Plaintiff." (*Id*.) On July 19, 2019, Plaintiff received a response to his request from RN Pant indicating that his chart review had been sent to Defendant Crompton and that he would be scheduled for an evaluation. (*Id*., PageID.17-18.)

Plaintiff saw Defendant Crompton again on July 19, 2019, at which time he again denied Plaintiff's requests for stronger pain medication, a knee brace, and MRI. (*Id*., PageID.18.) Plaintiff avers that his medical records indicate that he was given strengthening exercises, but that "he was not provided with any such treatment." (*Id*.) That same day, medical issued an order extending Plaintiff's use of a cane to August 15, 2019. (*Id*.)

On July 30, 2019, Plaintiff submitted a request for stronger pain medication, alleging that "the ibuprofen was not strong enough to combat the pain and was making [him] constipated." (*Id*.) On July 31, 2019, Plaintiff had a therapy session, during which he expressed his concerns over being deprived adequate medical care. (*Id*.) Plaintiff saw [non-party] Nurse Mason on August 1, 2019, and avers that she was "very rude" and told Plaintiff he would have to pay a copay because his request did not constitute follow-up care. (*Id*., PageID.18-19.) Plaintiff "politely excused himself" and left. (*Id*., PageID.19.) Shortly thereafter, he was given naproxen to replace the ibuprofen, but avers that it "was not effective as well to combat the severe pain [he] was in." (*Id*.)

Opinion at PageID.374-376.

### C. Dr. Crompton's treatment commencing in October 2019

Plaintiff's allegations resume after a two-month gap when he submitted another medical request on October 11, 2019, stating that the ibuprofen and naproxen had not helped and that he continued to experience sharp pain in his knee. (*Id*.) Plaintiff indicated that he could not jog or squat "without excruciating pain and a feeling of collapsing." (*Id*.) He could not walk up and down stairs without pain and stated that his knee constantly "pops." (*Id*.) Plaintiff reiterated his requests for an MRI, knee brace, and stronger medication. (*Id*.) On October 13, 2019, [non-party] Nurse Mason responded, but Plaintiff avers that the response only

"documents the need to consult about stronger pain medication." (*Id*., PageID.19-20.) Plaintiff saw [non-party] Nurse Pant on October 15, 2019, in response to his medical request. (*Id*., PageID.20.) Nurse Pant "notably documented the existence of (1): tenderness (2): palpable distal pulses (3): pain with movement (4): swelling (5): crepit[u]s and popping with passive range of motion, and (6): tenderness to medial knee and patella tendon area." (*Id*.) He noted that Plaintiff's requests for an MRI, knee brace, and stronger pain medication would be forwarded to Defendant Crompton. (*Id*.)

Plaintiff saw Defendant Crompton on October 16, 2019. (*Id*.) Defendant Crompton checked Plaintiff's blood pressure and heart, had Plaintiff weigh himself, and used a tape measure to check the circumference of Plaintiff's right thigh and calf muscles. (*Id*.) Defendant Crompton asked Plaintiff to perform a squat, and Plaintiff responded that he was physically unable to comply. (*Id*., PageID.20-21.) Plaintiff reasserted his requests for an MRI, knee brace, and stronger pain medication. (*Id*., PageID.21.) Defendant Crompton "acknowledged the knee was swollen and the presence of pain existed, but wholly failed to document that in his medical report of October 16, 2019, . . . even though RN Pant documented it in his report the previous day." (*Id*.) Plaintiff also asked to see an orthopedic surgeon, but Defendant Crompton "replied that with a patella dislocation, an orthopedic surgeon is never required to consult with, nor is an MRI ever needed because no structures are ever damaged." (*Id*.) He told Plaintiff that "it could be up to 2 years before the knee could become healed." (*Id*.)

Plaintiff filed a grievance concerning Defendant Crompton's care on October 18, 2019. (*Id*.) Defendant Bellinger responded, noting that Plaintiff was being referred to Defendant Crompton because of his continued complaints. (*Id*., PageID.21-22.) Plaintiff, however, avers that Defendant Crompton "never again consulted with [him] about his injury." (*Id*., PageID.22.)

On November 23, 2019, Plaintiff requested medical care after injuring his lower back "when he went to reach down to retrieve a book but bent awkward[ly] because he was forced to factor in his injured right knee." (*Id*.) Plaintiff saw [non-party] Nurse Dankert on November 26, 2019, for his lower back and sciatic pain. (*Id*., PageID.23.) Nurse Dankert "ordered a hot water bottle detail and rest." (*Id*.)

More than a year after the initial injury, Plaintiff saw Defendant Crompton in August 2020 for chronic care. (*Id*.) He told Defendant Crompton that he "was still experiencing problems with his knee; constant pain, discomfort, popping and grinding, a feeling the knee would give out, and constant instability." (*Id*.) Plaintiff alleges that Defendant Crompton responded that "he didn't care because Plaintiff must be lying, and that Plaintiff needed to leave the medical room." (*Id*.) Plaintiff left, but returned to ask a question, at which time Defendant Crompton allegedly "rose from his chair and aggressively began charging after Plaintiff." (*Id*.)

6

On January 24, 2021, Plaintiff was moved to an adjacent cell because of close contact regarding COVID-19. (*Id*.) As he was cleaning the new cell on January 25, 2021, "he made a quick turn and his knee slipped out of place, but then slid back into place again; the injury is medically referred to as a subluxation. And it was very painful." (*Id*.) Plaintiff saw Defendant Bellinger the next day for a rapid COVID-19 test and told him what happened; Defendant Bellinger stated, "I'm not here for that, just for Covid testing." (*Id*.) According to Plaintiff, he was in severe pain, his right knee was swollen and unstable, and he could not shower for four days because of the injury. (*Id*.)

On February 7 or 8, 2021, Plaintiff was bunked with inmate O'Brien, who also had COVID-19. (*Id*., PageID.23-24.) Plaintiff avers that inmate O'Brien required health care for breathing complications, and Defendant Crompton ultimately responded. (*Id*., PageID.24.)  Plaintiff relayed inmate O'Brien's responses to Defendant Crompton. (*Id*.) Afterwards, Defendant Crompton asked Plaintiff how he was. (*Id*.) Plaintiff told him about the subluxation that had occurred two weeks prior. (*Id*.) Defendant Crompton responded that Plaintiff was lying and "needed to stop faking the injury." (*Id*.) Plaintiff "swore that he was telling the truth." (*Id*.) Defendant Crompton responded, "You're not in pain; you have since fully recovered; and I doubt you slipped the kneecap out again." (*Id*.)

Plaintiff saw Defendant Crompton again on August 6, 2021, for an annual checkup for his high blood pressure and bottom-bunk status for his parasomnia. (*Id*.) Plaintiff told Defendant Crompton that he was still having issues with his knee. (*Id*.) Defendant Crompton responded that Plaintiff could not have any problems and that it was "in his head." (*Id*.) Plaintiff asked to see an orthopedic specialist. (*Id*.) Defendant Crompton denied the request and said that Plaintiff was lying about his pain, discomfort, and instability. (*Id*.) Plaintiff avers that his "knee remains in constant pain and instability." (*Id*., PageID.25.)

Plaintiff submitted various grievances about the events set forth supra. He was interviewed about his grievance concerning Defendant Martinson by [Former] Defendant Lively. (*Id*., PageID.29.)  [Former] Defendant Lively told Plaintiff that she would speak to Defendants Martinson and Sheppard, and then "get back with" [Former] Defendant Bassett. (*Id*., PageID.31.) According to Plaintiff, [Former] Defendant Lively said the process "would be continued most likely with Internal Affairs." (*Id*.) Plaintiff, however, received a rejection of his grievance as untimely from [Former] Defendant Bassett on August 27, 2019. (*Id*.) Ultimately, all of Plaintiff's grievances were denied, and [Former] Defendants Bassett, Clouse, and Parish were involved in those denials. (*Id*., PageID.31-41.)

Plaintiff seeks injunctive relief directing that he be seen by an orthopedic specialist, declaratory relief, and compensatory and punitive damages. (*Id*., PageID.71-75.).

Opinion at PageID.376-379.

7

### D. Margosian's Eighth Amendment claims

Based on his allegations, the Court found that Margosian alleged that defendants CO Martinson, CO Sheppard, Nurse Bellinger and Dr. Crompton "violated his Eighth Amendment rights by failing to provide adequate medical care and delaying the receipt of medical care for his right knee injury." Opinion at PageID.383. Plaintiff also had a related Eighth Amendment claim that "[d]efendant Martinson violated [Margosian's] Eighth Amendment rights by delaying his medical treatment to take pictures of his injury and post them on social media." *Id.*

## II. Legal standard

### A. Summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support

> plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B.     Lack of Exhaustion

#### 1.     Exhaustion requirement

Defendants contend that Margosian failed to exhaust his claims against them. The Prison Litigation Reform Act (PLRA) provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007).

In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

9

### 2. MDOC Grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* MDOC Policy Directive ("PD") 03.02.130 (effective March 18, 2019). A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ Q. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ Q and S. The Policy Directive provides the following directions for completing grievance forms:

> The issues should be stated briefly but concisely. Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ S (emphasis in original). The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ W. If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ DD. Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ HH.

### III. Discussion

In addressing Margosian's grievances, the Court is aware that "the primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued" and that "the grievance is not a summons and complaint that initiates adversarial litigation". *Jones*, 549 U.S. at 219, quoting *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004). Under PD 03.02.130, a prison official is not alerted to the "problem" being grieved

unless that problem is identified by the prisoner listing the "[d]ates, times, places and names of all those involved in the issue being grieved."

### A.     Grievances related to MDOC defendants

The MDOC defendants identified three grievances which name them and which address the claims alleged in Margosian's complaint.

#### 1.     ECF-19-07-1446-12e3/28c ("1446")

In this grievance, Margosian complained that defendant Nurse Bellinger committed six different acts of deliberately indifference with respect to Margosian's serious medical needs at different times and places on July 11, 2019.  Grievance 1446 (ECF No. 37-3, PageID.615-617).  The Grievance Coordinator sent Margosian a receipt for the Step I grievance dated July 15, 2019.  Grievance 1446 (ECF No. 43-8, PageID.803).[1]   Ultimately, the MDOC issued a Grievance Rejection Letter dated August 7, 2019, which stated that:

> Your grievance is being returned to you without processing for the reason that you are in violation of PD-03.02.130.  This procedure states that you must limit your grievance to one (1) issue per grievance.  You have included more than one (1) issue as prescribed in this procedure.  Grievance denied at first step.

Grievance 1446 (ECF No. 43-9, PageID.805).

In his Step II appeal, Margosian stated that while the grievance was rejected for raising "multiple issues," his grievance was not misleading or ambiguous, that the facts were stated unequivocally, and that it involved Nurse Bellinger's conduct at various times on July 11, 2019.  Grievance 1446 at PageID.613.  At Step II, the MDOC stated that the grievance was rejected at Step I because it was "vague, illegible, or <u>contains multiple unrelated issues</u>."  *Id*. at PageID.807.  The rejection was upheld at Step II after review by the Warden's Office in accordance with PD 03.02.130.  *Id*. In his Step III appeal, Margosian stated that his grievance was legible and that it

---

[1] The Court notes that portions of Grievance 1446 appear in two different exhibits.

did not contain "multiple unrelated issues." *Id*. At Step III, the MDOC stated that "The rejection is upheld." *Id*. at PageID.612.

In addition to rejecting Grievance 1446 for containing multiple unrelated issues, defendants state that "Margosian did not include the Step II and III responses for ECF-1446 in his Step III appeal, so the grievance could also be separately rejected on this independent basis." MDOC Defendants' Brief (ECF No. 37, PageID.579). In his affidavit filed with defendants' reply, Richard Russell, Hearings Administrator and the Manager of the Grievance Section in the Office of Legal Affairs (OLA) of the MDOC, stated the requirements for a prisoner's submission of a Step III appeal:

> For a Step III submission to be considered complete, it must include the Step I grievance and response, Step II appeal and response, and Step III appeal. Step III submissions which are untimely or incomplete are subject to rejection at Step III. Each complete Step III submission received and processed by my office has already been assigned a grievance identifier at Step I consisting of the facility's three-letter abbreviation, the year of the grievance's filing, the month of the grievance's filing, a number unique to each grievance, and the grievance category code; the identifier is often abbreviated using the facility abbreviation and the unique number.

Russell Aff. (ECF No. 48, pageID.865). With respect to grievance 1446, Manager Russell stated:

> ECF-1446 was rejected at Step I as containing multiple issues. ([Grievance 1446], PageID.613.) ECF-1446 complained of multiple issues, including issues related to a emergency room visit to the Munson Manistee Hospital, a non-MDOC and non-State-of-Michigan entity. Margosian's Step III submission for ECF-1446 did not include the Step I or II responses, and it could have been independently rejected at Step III on that basis; but because the database does not allow the grievance category code to contain multiple basis for rejection, only the Step I rejection code was entered into the database.

Russell Aff. at PageID.866.

Based on this record, Margosian did not properly exhaust the claims raised in Grievance 1446. *Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93. Accordingly, defendants' motion for summary judgment should be granted as to Nurse Bellinger.

12

### 2.   ECF-19-07-1487-17x/28e ("1487")

In this grievance, Margosian complained that defendants CO Martinson and CO Sheppard were deliberately indifferent to his serious medical needs on July 11, 2019, because they took two hours to transport him to the emergency section of the hospital. Margosian stated that it is a seven to eight-minute drive from the correctional facility to the hospital but that the individuals grieved (Martinson and Sheppard) unnecessarily held him in the Control Center for 45 minutes and failed to prearrange proper transportation. Grievance 1487 (ECF No. 37-3, PageID.645). In denying the grievance at Step I, the respondent cited an ECF Operating procedure:

> Transporting prisoners outside of correctional facilities must be viewed as a serious undertaking demanding the highest level of professionalism and competence. Security must never be compromised.

*Id*. at PageID.646. The respondent addressed the grievance as follows,

> After reviewing the grievance filed by prisoner Margosian and ECF OP 04.04.135 Off Site Prisoner Transportation, staff conducted themselves appropriately to provide Margosian with transportation to an off site [sic] for further medical evaluation. Health Care determined that the injury to prisoner Margosian was not life threatening and that he could be tranfered [sic] by State Van to Manistee Munson Hospital. Grievance denied.

*Id*.

While the MDOC issued an "attached" Step II response, the attachment was not included in Margosian's grievance file submitted to the Court. *Id*. at PageID.644. In his Step III appeal, Margosian provides the basis for the Step II response stating, "Warden Parish has merely stated in his Step II response that Transport personnel and Medical personnel were sufficient in their duty." *Id*. The Step III appeal was rejected. *Id*. at PageID.643.

In explaining this grievance, defendants state that it was "untimely received" at Step III and that, "[a]s with many of Margosian's Step III submissions, he did not include the Step II response for ECF-1487 in his Step III appeal, so the grievance could also be separately rejected

13

on this independent basis." MDOC Defendants' Brief at PageID.579-580. With respect to grievance 1487, Manager Russell stated:

> ECF-1487 was received and filed at Step III on September 26, 2019, more than ten business day from the date the Step II response was returned to Margosian (August 8, 2019) (ECF No. 47-3, PageID.644), making his Step III appeal untimely; the grievance category code for ECF-1487 was changed to 28e to reflect the timeliness rejection (*id.*, PageID.643). Margosian's Step III submission for ECF-1487 did not include the Step II response, and it could have been independently rejected at Step III on that basis; but because the database does not allow the grievance category code to contain multiple basis for rejection, only the rejection code for untimeliness was entered into the database.

Russell Aff. at PageID.866.

Based on this record, Margosian did not properly exhaust the claims raised in Grievance 1487. *Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93. Accordingly, defendants' motion for summary judgment should be granted as to Margosian's deliberate indifference claims against CO Sheppard and his claim against CO Martinson regarding an alleged delay in transporting him to the off-site hospital.

        3.      **ECF-19-08-1571-28e ("1571")**

In this grievance, Margosian complained that defendant CO Martinson was deliberately indifferent to his serious medical needs on July 11, 2019, for delaying treatment at the hospital. Grievance 1571 (ECF No. 37-3, PageID.625). The gist of the grievance is that "Officer Martinson (name stipulated) commited [sic] a slew of violations when he prolonged Grievant's medical emergency on July 11, 2019, when he, refused to take Grievant into the emergency section of Munson Manistee Hospital, because he wanted to 'Snapchat' a picture of Grievant's dislocated knee first." *Id*. (emphasis omitted).

The MDOC rejected the grievance at Step I as untimely. *Id*. at PageID.628. In this regard, while the incident allegedly occurred on July 11, 2019, Margosian did not complete the

grievance almost three weeks later (July 30, 2019). *Id*. at PageID.625. While the MDOC issued an "attached" Step II response, the attachment was not included in Margosian's grievance file submitted to the Court. *Id*. at PageID.620. The Step III response stated that "the rejection is upheld". *Id*. at PageID.619.

Once again, defendants point out that Margosian did not follow the procedure for submitting a Step III appeal, stating that "Margosian did not include the Step II response for ECF-1571 in his Step III appeal, so the grievance could also be separately rejected on this independent basis." MDOC Defendants' Brief at PageID.579. With respect to grievance 1571, Manager Russell stated:

> ECF-1571 was received at Step I on August 1, 2019 ([Grievance 1571], PageID.625); although it was originally coded as 17a to be processed as a "general harassment" grievance (*id.*, PageID.627), it was rejected at Step I as untimely because he filed it more than seven business days from the date of the incidents being grieved (July 11, 2019) and more than five business days from the date that he attempted to resolve his grievance (July 14, 2019) (*id.*, PageID.625). ECF-1571 was received and filed at Step III on December 17, 2019, more than ten business day [sic] from the date the Step II response was returned to Margosian (September 13, 2019) (*id.*, PageID.620), making his Step III appeal untimely. Margosian's Step III submission for ECF-1571 did not include the Step II response, and it could have been independently rejected at Step III on that basis; but because the database does not allow the grievance category code to contain multiple basis for rejection, only the Step I rejection code was entered into the database.

Russell Aff. at PageID.866-867.

Based on this record, Margosian did not properly exhaust the deliberate indifference claims raised in Grievance 1571 related to CO Martinson's delay in treatment. *Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93. Accordingly, defendants' motion for summary judgment should be granted as this claim alleged against CO Martinson.

### 4.     Other grievances against the MDOC defendants

In his response, Margosian refers to three additional grievances: ECF-19-07-1461-12d2 ("1461"); ECF-19-07-1495-28a ("1495"); and ECF-19-07-1496-28a ("1496"). However, none of these grievances name defendants Nurse Bellinger, CO Martinson, or CO Sheppard as the party grieved. In Grievance 1461, Margosian complained that he was not seen by "any medical personnel" after returning back from the hospital on July 11, 2019. *See* Grievance 1461 (ECF No. 37-3, PageID.656). In Grievance 1495, Margosian complained that Unknown Doe(s) were negligent for failing to contact the hospital to inform them that a prisoner would be arriving with a knee injury. *See* Grievance 1495 (ECF No. 37-3, PageID.660). Finally, in Grievance 1496, Margosian complained of the actions taken by Unknown Doe(s), Unknown Medical Personnel, and Unknown Personnel. *See* Grievance 1496 (ECF No. 37-3, PageID.642).

### B.     Grievance related to defendant Dr. Crompton

Defendant Dr. Crompton identified one grievance which names him and is related to Margosian's claims, *i.e.*, ECF-19-10-2074-12d3 ("2074") (ECF No. 27-1, PageID.485-491). In this grievance, Margosian complained that when he met with Dr. Crompton on October 16, 2019, the doctor denied his renewed requests for stronger pain medication, an MRI, and a knee brace. Grievance 2074 at PageID.489. The respondent stated:

> On 10/15/2019 you were seen by RN Pant. Electronic Health Record (HER) has recorded your request for different pain meds, an MRI and popping and grinding in your knee. RN Pant made a referral to Medical Provider (MP). No mention of MRI during RN visit notes. The HER has recorded MP visit by Dr. Crompton on 10/16/2019 with your complaints of "persistent discomfort to R. knee["]. Provider indicates knee is healing appropriately. He advised exercises to follow up as needed.

*Id*. at PageID.490. The MDOC concluded that Margosian's grievance was partially resolved:

> You kited Health Services with knee complaints for which you were evaluated by RN Pant on 10/15/2019. RN Pant made a referral for a Medical

> Provider. You were evaluated by Dr. Crompton for your complaints. Treatment plan includes exercises. Because of your continued complaint, you are being refered [sic] to the provider. Grievance partially resolved.

*Id*.

The MDOC denied the Step II appeal, stating in part:

> Grievant's claim is not supported. He has been evaluated and treated as deemed appropriate based on his clinical presentation. While grievant's disagreement with the plan of care is noted, such disagreement does not inherently support his claim. Grievant is encouraged to discuss his symptoms and concerns with the provider at his scheduled visits, to follow the plan of care as instructed, and to promptly notify Health Care if he experiences acute adverse symptoms in future and/or is he has any further concerns re: chronic symptoms or issues.

*Id*. at PageID.488.

Margosian appealed to Step III. However, the appeal was rejected as untimely:

> In accordance to PD 03.02.130 grievances are to be rejected when untimely. Pursuant to policy, this grievance was untimely filed by the grievant at the Step III appeal. The grievant's Step III appeal was received on January 6, 2020. While providing a grace period for standard mail; the grievance however was still not received in a suitable timeframe after the due date of December 21, 2019.

*Id*. at PageID.486.

Based on this record, Margosian did not properly exhaust the claims raised in Grievance 2074. *Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93. Accordingly, Dr. Crompton's motion for summary judgment should be granted.

### IV. Recommendation

For these reasons, I respectfully recommend that the motions for summary judgment filed by Dr. Crompton (ECF No. 27) and MDOC defendants' Nurse Bellinger, CO Martinson and CO Sheppard (ECF No. 36) be **GRANTED** and that this action be terminated.

Dated: January 6, 2023     /s/ Ray Kent
                           RAY KENT
                           United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).